SHE ENTERPRISES, INC. *vs.* STATE BUILDING CODE
APPEALS BOARD & another.[1]

Suffolk.   April 10, 1984. — June 28, 1985.

Present: ARMSTRONG, CUTTER, & WARNER, JJ.

*Administrative Law*, Judicial review, Burden of proof, Failure to raise
issue before agency, Regulations. *State Building Code. Due Process of
Law*, Vagueness of regulation.

On appeal by the owner of a nightclub from a judgment affirming a decision
of the State Building Code Appeals Board that the nightclub was oper-
ating in violation of the State Building Code, this court declined to
consider evidence offered by the owner to show discriminatory or retaliat-
ory enforcement of the code, where the evidence had not been presented
before the board and where the record did not support the owner's
contention that the board had refused to consider such evidence. [273-
276]
Evidence before the State Building Code Appeals Board supported the
board's conclusion that the use of certain premises had changed from a
restaurant to a nightclub, a different classification under the State Build-
ing Code requiring a permit for change of use and occupancy. [276]
A distinction in the State Building Code between restaurant and nightclub
in use category was not unconstitutionally vague. [276-278]
Error by a building inspector in issuing a certificate of occupancy for
nightclub use for premises formerly used as a restaurant without first requiring
an application for a permit for change of use to be submitted did not estop
the building inspector from subsequently requiring that a permit for change
of use be obtained if the premises are used as a nightclub. [278 ]

CIVIL ACTION commenced in the Superior Court Department
on February 6, 1980.

The case was heard on a master's report by *George W.
Cashman*, J., sitting under statutory authority.

*Kenneth H. Tatarian* for the plaintiff.

*Kim E. Murdock*, Assistant Attorney General, for State
Building Code Appeals Board.

[1] The commissioner of code inspection of Worcester.

*James F. Bergin*, Assistant City Solicitor, for Commissioner of Code Inspection of Worcester.

ARMSTRONG, J. The plaintiff, doing business in Worcester under the name "Blue Max Casino," appealed under G. L. c. 30A, § 14, from a decision of the State Building Code Appeals Board (board).[2] The board's decision had affirmed a determination by Worcester's commissioner of code inspection (building inspector) that the Blue Max Casino was operating in violation of the State Building Code (Code) until such time as it should apply for and be granted a certificate for change of use and occupancy, which was required (the building inspector ruled) because the plaintiff had changed the use of the premises from "restaurant" to "nightclub." The plaintiff maintains that it has not changed its use of the premises, that the portions of the Code relied on by the building inspector are unconstitutionally vague, and that the building inspector's enforcement ruling was an unlawful retaliation against the plaintiff for the form of entertainment provided in the Blue Max Casino, namely, nude dancing. A judge sitting by statutory authority in the Superior Court affirmed the board's decision, following the recommendation of a special master, and the plaintiff appealed.

Procedurally the case was complicated in the Superior Court by the plaintiff's submission of a mass of extra-record material bearing, its counsel argued, on the question of discriminatory or retaliatory enforcement. He asked the court to make findings on this aspect of the case under the authority of G. L. c. 30A, § 14(6), as amended by St. 1976, c. 411, §§ 1 & 2. The plaintiff relies heavily in this court on what it terms a "finding" by the special master that "[i]t would be naive to believe that the local Board [presumably meaning the building inspector,

---

[2] The State Building Code Appeals Board which rendered (in 1980) the decision appealed from was created by G. L. c. 23B, § 23, inserted by St. 1972, c. 802, § 1, and was abolished, without the creation of a successor agency, by St. 1981, c. 351, § 272. The last section was itself repealed by St. 1984, c. 348, § 14, but other sections of the 1984 act (§§ 2 and 10) again abolished the board and reconstituted it. See. G. L. c. 143, § 100, inserted by St. 1984, c. 348, § 10. The functions and duties of the board as established by G. L. c. 143, § 100, are for the most part identical to those of the earlier board.

no local board having acted in the matter] acted other than in response to local reaction to what some consider to be entertainment of an immoral nature."

Section 14(6) does not authorize a reviewing judge to consider extra-record evidence and make findings. It authorizes a judge, upon a showing that evidence not offered before the agency is material to the issues in the case and that there was good reason for the failure to present it to the agency, to "order that the additional evidence be taken before the agency," which "may modify its findings and decision by reason of such additional evidence." As a general rule it may be said that a court reviewing an administrative decision under § 14 has authority to hear evidence and make findings only in cases where that is necessary to establish procedural irregularities not disclosed in the agency record. § 14(5). See *Conley* v. *Division of Employment Security*, 340 Mass. 315, 318 & n.5 (1960); *Duato* v. *Commissioner of Pub. Welfare*, 359 Mass. 635, 639 (1971). In this case no undisclosed procedural irregularity is alleged. Compare *Marmer* v. *Board of Registration of Chiropractors*, 2 Mass. App. Ct. 162, 168 (1974). Accordingly we disregard the additional extra-record material submitted to the judge as well as the observations of the special master. We confine our review to the record of proceedings before the board.

That record shows a total failure by the plaintiff to make, before the board, the requisite showing that the building code "enforcement system had a discriminatory effect or that it was motivated by a discriminatory purpose." *Wayte* v. *United States*, 470 U.S. 598, 608 (1985), and cases cited. True, the plaintiff listed discriminatory enforcement as one of several grounds it alleged for reversal of the building inspector's ruling. Sustaining the ground, however, required an evidentiary showing, as to which the burden was on the plaintiff. *Ibid.* See also *Commonwealth* v. *King*, 374 Mass. 5, 22 (1977). "Except for jurisdictional claims based upon constitutional challenges to an agency's enabling legislation, litigants involved in adjudicatory proceedings should raise all claims before the agency, including those which are constitutionally based." *Gurry*

v. *Board of Pub. Accountancy*, 394 Mass. 118, 126 (1985). "The general rule is that it is too late to raise a claim before a reviewing court if the point ha[s] not been raised before the administrative agency." *M. H. Gordon & Son* v. *Alcoholic Beverages Control Commn.*, 386 Mass. 64, 68 (1982), citing *Charron's Case*, 331 Mass. 519, 523 (1954). *Norway Cafe, Inc.* v. *Alcoholic Beverages Control Commn.*, 7 Mass. App. Ct. 37, 39-40 (1979).

There are exceptions to that principle. One arises when the agency takes the position that it will not consider or rule on the claim. *M. H. Gordon & Son* v. *Alcoholic Beverages Control Commn.*, 386 Mass. at 69. *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. at 126. That is what the plaintiff says happened in this case. To support that position, he cites two pages of the administrative transcript, both of which were omitted from the appendix. See *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. 684, 687-691 (1978); *Iverson* v. *Board of Appeals of Dedham*, 14 Mass. App. Ct. 951, 951-952 (1982); *Telecon, Inc.* v. *Emerson-Swan, Inc.*, 17 Mass. App. Ct. 671, 673 (1984). To guard against the possibility of mere inadvertence, we exercised our discretion to examine the original record in the Superior Court.

The missing pages contain a statement by the chairman of the board's three-member hearing panel[3] which, read out of context, would appear to say that the board was unwilling to consider any issue other than whether there had been a change of use of the casino premises. The context sheds a different light on the statement. Counsel for the plaintiff had presented the plaintiff's case primarily by unsworn statements of counsel, together with documentary evidence. At the crucial point he was offering to the board a copy of a letter by the building inspector to the Worcester Telegram & Gazette. Objection was made to the newspaper copy. It was noticed that the newspaper copy differed from the typewritten copy. The typewritten copy

---

[3] Although the full board consisted of eleven members, see G. L. c. 23B, §§ 16 and 23, inserted by St. 1972, c. 802, § 1, § 23 provided for appeals to be heard and decided by three members designated by the chairman.

was indistinct in some places. The letter dealt not only with building code problems but also zoning violations and violations of another local ordinance. The chairman ruled that the newspaper copy would not be accepted. Plaintiff's counsel started to speak, and the city solicitor objected to the board's receiving the unsworn statements of the plaintiff's counsel in place of testimony and also objected to his raising of extraneous issues. At this point the chairman stated: "The issue before us, as I see it right now, and you may correct me or expand it as you wish, is that there is an argument as to whether or not there was a change in use and occupancy. Fundamentally, that's the only matter that this board is willing to consider. Is that agreeable? Does anybody see it any differently than that?" The plaintiff's counsel responded, "I don't because . . . ." The chairman interjected: "We have no say on zoning or local ordinance type regulations . . . [b]ut where with respect to the Code . . . [i]f indeed someone of the group here can prove there was indeed a change in use and occupancy, that's first-class evidence of what . . . we have to decide this case on. Now, unless you have more to substantiate your case — I think you told us the story. You have the right to rebut." The plaintiff's counsel responded, "All right." Then the chairman turned to the city solicitor, who put in his case through the building inspector. At no point in the hearing was the question of discriminatory enforcement expressly raised or excluded.

In context we read the chairman's statement simply to say that the board would hear only the question arising under the Code, not those arising under the zoning ordinance or other local ordinances. If plaintiff's counsel interpreted the statement more restrictively, it was his duty to respond to the chairman's request that any differing view be made known. Instead, he expressed his assent. At no point did he ask the board to receive evidence bearing on discriminatory enforcement. There is no suggestion that he had witnesses who were prepared to testify on the question or that he was otherwise prepared to carry the plaintiff's burden. As in *Fanion* v. *Director of the Div. of Employment Security,* 391 Mass. 848, 851-852 (1984), the plaintiff "has not shown that 'there was good reason for failure

to present [the evidence] in the proceeding before the agency.'
G. L. c. 30A, § 14(6)."

On the single issue that was fully litigated at the agency
level, the board's decision must stand. It was uncontested, and
the board found, that the premises occupied by the Blue Max
Casino were previously run as a French restaurant called "Gerbe
de Ble," which was certified under the code as a restaurant
under the F3 use group.[4] The Blue Max Casino began operation
in early 1976 as an Italian restaurant. Modest physical altera-
tions were made, which (a building inspector told the propri-
etor) did not call for a building permit. The original certificate
of inspection and occupancy classified the use as "lounge/res-
taurant," which would be an F3 use. At least one and perhaps
two later certificates of inspection and occupancy referred to
the use classification as "F2/club," which would mean "night-
club," a use falling in the F2 use group (see note 4, *supra*).
The different classification reflected a changed emphasis in
the use of the premises from the 1976 Italian restaurant with
a full menu and incidental entertainment, to the 1978 establish-
ment featuring a very limited menu (pizza and sandwiches)
and "continuous . . . entertainment" ("The Home of Nude
Entertainment in Worcester County").

The plaintiff does not contest the board's interpretation of
its own regulations (i.e., the State Building Code[5]) as requiring

---

[4] The Code classifies all buildings within nine lettered "use groups,"
which are further broken down by numbers into subgroups. The "F" group
under the second edition of the Code in effect at the time of the building
inspector's enforcement decision covered "Assembly Buildings." The F3
subgroup (§ 208.3) included "restaurants other than nightclubs," and the
F2 subgroup (§ 208.2), which had more stringent building requirements,
included "nightclubs" and "dance halls." The F group classifications under
the second edition of the Code are the same in material respects as those
appearing as the A group in the present edition of the Code. See 780 Code
Mass. Regs. § 202 (1980). The present A2 and A3 subgroups are the same
as the F2 and F3 subgroups referred to in the text. See 780 Code Mass.
Regs. § 203 (1980).

[5] The Code was promulgated by the State Building Code Commission
(G. L. c. 23B, § 16), but the board (i.e., the State Building Code Appeals
Board) was "composed of the state building code commission established
by section sixteen." G. L. c. 23B, § 23, first par.

the issuance of a building permit, or permit for change of use and occupancy, before a building may lawfully be issued a certificate of occupancy for a use, such as nightclub, which falls in a different use category from an earlier use, such as a restaurant.[6] Rather, it challenges as impermissibly vague the distinction between "restaurant" and "nightclub," a vagueness said to be constitutionally invidious because it arms the enforcement official with an unreviewable discretion to discriminate against entertainment of the type offered by the plaintiff. While such entertainment has been held to be a constitutionally protected exercise of free expression, *Schad* v. *Mt. Ephraim,* 452 U.S. 61, 66 (1981); *Commonwealth* v. *Sees,* 374 Mass. 532, 537 (1978), the Code provisions in question are not shown to affect the plaintiff's ability to offer entertainment of that type but merely require that, if the use is changed to nightclub, the public safety regulations applicable to such a change of use be adhered to. Compare *Faith Assembly of God* v. *State Bldg. Code Commn.,* 11 Mass. App. Ct. 333, 335-337 (1981). Moreover, the Code's distinction between "nightclubs" and "restaurants other than nightclubs" is not, we think, one that an average layman would find difficult to apply,[7] *Caswell* v. *Licensing Commn. for Brockton,* 381 Mass. 873 (1983), and not at all difficult in the instance of the Blue Max Casino. Compare *Aristocratic Restaurant, Inc.* v. *Alcoholic Beverages Control Commn. (No. 1),* 374 Mass. 547, 552-553 (1978). It is well known that nightclubs present special public safety

---

[6] Section 105.2 (in the second edition) read in part: "CHANGE IN USE AND OCCUPANCY: It shall be unlawful to make any change in the use or occupancy of any structure or parts thereof without the building official having issued a certificate of use and occupancy indicating that such structure complies with the provisions of the Basic Code for the proposed new use . . ." Section 113.1 read in part: "WHEN PERMIT IS REQUIRED: It shall be unlawful to . . . change the occupancy of a building from one use group to another . . . without first filing an application with the building official in writing and obtaining the required permit therefor."

[7] Webster's Third New Int'l Dictionary (1971) defines restaurant (at 1936) as "an establishment where refreshments or meals may be procured by the public: a public eating house"; and nightclub (at 1527) as "a restaurant open at night usu. serving liquor, having a floor show, and providing music and space for dancing."

problems. See, e.g., *Commonwealth* v. *Welansky,* 316 Mass. 383 (1944).

The distinction drawn by the board between a restaurant offering occasional, or incidental, entertainment, where the primary emphasis is on serving food, and a nightclub, where food is served but the primary emphasis is on entertainment, comports with common usage and is a reasonable interpretation of the Code. An agency's reasonable interpretation of its own regulations, particularly if consistently applied, is entitled to respect in the courts. *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976). *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 782 (1980). *Morin* v. *Commissioner of Pub. Welfare,* 16 Mass. App. Ct. 20, 24 (1983). *Cliff House Nursing Home, Inc.* v. *Department of Pub. Health,* 18 Mass. App. Ct. 112, 115 (1984). *Morales* v. *Commissioner of Pub. Welfare,* 18 Mass. App. Ct. 239, 244 (1984).

There is no merit to the plaintiff's other contentions. If, as the building inspector concedes, his department erred in issuing a certificate of occupancy for nightclub (F2) use without having first required the plaintiff to apply for a permit for change of use, that error does not estop the building inspector from requiring compliance with the relevant Code provisions at this time. *Outdoor Advertising Bd.* v. *Sun Oil Co.,* 8 Mass. App. Ct. 872, 873 (1979). We note, in this connection, that the record does not disclose any reason why the plaintiff would be denied the requisite permit. Indeed, the board found that "[s]tructurally [the premises] would meet the requirements of the [C]ode for either the F2 or F3 (nightclub or restaurant) use," reflecting the position of the building inspector, who told the board that he was not aware of anything "in the Building Code . . . that would stop [the required] [p]ermit from being issued."

*Judgment affirmed.*