PAULA TARTARINI vs. DEPARTMENT OF MENTAL
RETARDATION.

No. 11-P-1009.

Suffolk. February 9, 2012. - July 23, 2012.

Present: SIKORA, CARHART, & SULLIVAN, JJ.

*Mentally Retarded Person. Department of Mental Retardation. Administrative Law,* Regulations, Agency's authority.

This court concluded that 115 Code Mass. Regs. § 2.01, a regulation of the Department of Mental Retardation (department) defining mental retardation and significantly sub-average intellectual functioning, is invalid, in that the definitions as currently drafted do not adequately fulfil the legislative directive that the department's regulations describe the clinical authorities on which the clinical judgments regarding intelligence are made; therefore, the department could not deny services on the basis of an assessment of intellectual functioning as provided in that regulation. [220-226]

CIVIL ACTION commenced in the Superior Court Department on June 1, 2009.

The case was heard by *Kimberly S. Budd,* J., on a motion for judgment on the pleadings.

*Thomas J. Frain* for the plaintiff.

*Marianne Meacham,* Special Assistant Attorney General, for the defendant.

SULLIVAN, J. Paula Tartarini appeals from a judgment of the Superior Court, issued pursuant to G. L. c. 30A, § 14(7), upholding a determination of the Department of Developmental Services, formerly the Department of Mental Retardation (department), finding Tartarini to be a person with borderline intelligence, not mental retardation, and therefore ineligible for services. See G. L. c. 123B, § 1, inserted by St. 1986, c. 599, § 39; 115 Code Mass. Regs. §§ 2.01 & 6.04(1) (2006).[1] We

[1]The statutes have been amended to change the name of the department,

reverse the judgment and order a new judgment remanding the case to the department for further proceedings.

*Statutory and regulatory background.* Because this case turns on the relationship between the statutory and regulatory definitions of mental retardation, we begin with the pertinent statute and regulation. General Laws c. 123B, § 1, defines "mentally retarded person" as follows:

> "[A] person who, as a result of inadequately developed or impaired intelligence, *as determined by clinical authorities as described in the regulations of the department* is substantially limited in his ability to learn or adapt, *as judged by established standards* available for the evaluation of a person's ability to function in the community" (emphasis supplied).

As relevant here, 115 Code Mass. Regs. § 2.01, as adopted in 2006, provides the following definition of "mental retardation":

> "Mental Retardation means *significantly sub-average intellectual functioning* existing concurrently and related to *significant limitations in adaptive functioning.* Mental retardation manifests before age 18." (Emphasis supplied.)

The same regulation defines "significantly sub-average intellectual functioning" to mean:

> "an intelligence test score that is indicated by a score of 70 or below as determined from the findings of assessment using valid and comprehensive, individual measures of intelligence that are administered in standardized formats and interpreted by qualified practitioners."

The mechanism for measuring intelligence is set forth in 115 Code Mass. Regs. § 6.02(3)(b) (2006).

In addition, the regulations define "adaptive functioning" to include three areas: (1) independent living/practical skills; (2)

effective June 30, 2009, see G. L. c. 19B, § 1, as amended through St. 2008, c. 182, §§ 9 & 115, & St. 2008, c. 451, §§ 28 & 187, and to substitute the words "intellectual disability" for the words "mental retardation," effective November 1, 2010, see G. L. c. 123B, § 1, as amended through St. 2010, c. 239, §§ 39-41. Because this matter arose under the previous statutes, the parties and the court have used the term "mental retardation."

cognitive, communication, and academic/conceptual skills; and (3) social competence/social skills. 115 Code Mass. Regs. § 2.01. Significant limitations in adaptive functioning are defined, in part, by reference to scores on standardized tests that measure the individual's adaptive functioning in these areas. See *ibid.*

*Factual background.* Tartarini had intelligence (IQ) test scores of 71 at age 18, 69 at age 40, and 71 at age 42. The department's hearing officer found that the score for the test administered closest to the age of 18 was determinative,[2] and that the standard error of measurement of plus or minus 5 points should not be applied in view of Tartarini's education and work history.[3] Both the department's expert witness and the hearing officer found that the IQ score of 71 exceeded the cut-off score of 70, and that it was therefore not necessary to consider evidence of adaptive functioning. However, both did assess, in the alternative, Tartarini's adaptive functioning. The department's expert testified that Tartarini's scores on standardized tests of adaptive functioning did not meet the eligibility requirements set forth in § 2.01, and that Tartarini's scores were consistent with information concerning her education, work history, and daily living. The hearing officer found that Tartarini had tested sufficiently well on standardized tests of adaptive functioning to conclude that she did not have significant limitations in this area.[4] The

---

[2] A contemporaneous evaluation described Tartarini as having "borderline intelligence." A later evaluation described her as mildly mentally retarded. Because the regulations require that mental retardation manifest before age 18, the hearing officer looked to the evaluation most proximate to that time.

[3] The evidence showed that Tartarini had completed high school, had received a certificate from a community college, and had held jobs at a Boston law firm (from which she was fired for engaging in inappropriate conduct) and at the Federal Reserve Bank, from which she had been laid off. She traveled to and from the bank by public transportation. The evidence also showed that she lived at home with her mother at all times and was assisted in substantial measure by her mother in many aspects of daily living; that she experienced difficulty maintaining her personal hygiene, managing time and money, cooking and caring for herself; and that she may have placed herself at risk in her dealings with strangers, demonstrating both gullibility and naiveté, as well as an ill-defined sense of sexual boundaries.

[4] Although there was evidence in the record concerning mental health conditions as well, including specific diagnoses, the impact of these conditions on Tartarini's intellectual functioning and adaptive abilities was not considered by either the department's expert or the hearing officer.

Superior Court judge, noting the deference which administrative decisions must be accorded, affirmed in all respects.

*Discussion.* On appeal, Tartarini challenges the validity of the regulatory scheme. Tartarini argues that the definition of significantly sub-average intellectual functioning in 115 Code Mass. Regs. § 2.01 is in excess of statutory authority and contrary to law. See G. L. c. 30A, § 14(7). We do not reach the other arguments raised by Tartarini, as we hold that this is the rare case where the departmental regulation is invalid because it is inconsistent with the legislation that authorized it. See G. L. c. 30A, § 14(7)(*b*). See also *Costa* v. *Fall River Hous. Authy.*, 71 Mass. App. Ct. 269, 274 (2008), *S.C.*, 453 Mass. 614 (2009), citing *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006) (questions of interpretation of regulations, like statutes, receive de novo review). For the reasons stated below, we conclude that the definitions of mental retardation and significantly sub-average intellectual functioning, as they are currently drafted, do not adequately fulfil the legislative directive that clinical authorities be described in the regulations. As a result, we conclude that the department cannot deny services on the basis of an assessment of intellectual functioning as provided in 115 Code Mass. Regs. § 2.01.

"In determining the validity of the subject regulation, we recognize that an administrative regulation is 'not to be declared void unless [its] provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate, and enforcement of such regulation[] should be refused only if [it is] plainly in excess of legislative power.' *Dowell* v. *Commissioner of Transitional Assistance*, 424 Mass. 610, 613 (1997), quoting from *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595-596 (1992). Further, a party who questions the facial validity of a regulation 'bears the heavy burden of "proving on the record 'the absence of any conceivable ground upon which [the regulation] may be upheld' " ' (citation omitted). *Id.* at 612." *Green's Case*, 52 Mass. App. Ct. 141, 144 (2001). This principle, however, is one of deference, not abdication. *Ciampi* v. *Commissioner of Correction*, 452 Mass. 162, 166 (2008). *Gauthier* v. *Director of the Offic·· of Medicaid*, 80 Mass. App. Ct. 777, 790 (2011).

The definition of mental retardation applicable to this case was adopted by the department in 2006. The regulation in effect before 2006 did describe clinical authorities, see G. L. c. 123B, § 1:

> "*Mental retardation* means, consistent with the currently (1994) accepted clinical authority of the American Association on Mental Retardation, substantial limitations in present functioning."

115 Code Mass. Regs. § 2.01 (1994). The previous regulation further stated that "[m]ental retardation begins before age 18, and is manifested by significantly sub[-]average intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas . . . ." *Ibid.* The pre-2006 regulation did not contain a specific definition of sub-average intellectual functioning, instead relying on the incorporated clinical authorities.

The department revised the regulations in 2006 after a judge of the Superior Court, relying on the guidelines promulgated by the American Association on Mental Retardation (AAMR) (now the American Association on Intellectual and Developmental Disabilities [AAIDD]), entered judgment on behalf of an applicant whose IQ scores ranged from 75 to 83. The judge rested his decision on the AAMR guidelines, finding that there was "no reference to a bright-line IQ cut-off score on which the [d]epartment's argument depends." See *Melican* v. *Morrissey*, 20 Mass. L. Rep. 723, 727 (Super. Ct. 2006).

The department argues that it was entitled to amend its regulations to respond to the omission identified in the decision. The department also argues that it was entitled to reject the AAMR standards as controlling when it promulgated the 2006 regulations. It maintains that the 2006 regulations, in fact, are based on "evolving standards" and that the regulations are based on "standardized testing" and the "appropriate exercise of clinical judgment." We agree that the department may alter or amend its regulations, consistent with applicable law, and that it has considerable discretion in defining sub-average intellectual functioning in accordance with clinical authorities. See *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of*

*Educ.*, 436 Mass. 763, 774 (2002). However, contrary to the statutory requirement, the 2006 regulations fail to describe the clinical authorities upon which the clinical judgments regarding intelligence are made. Cf. *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 774-775 (1980).

The Legislature did not give the department unfettered discretion to define mental retardation. The statute requires that the department's regulations be based on "clinical authorities." G. L. c. 123B § (1). The statute further requires that the clinical authorities be "described in the regulations." *Ibid.* The statutory language is unequivocal. See *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 646 (2000) ("[a]n agency regulation that is contrary to the plain language of the statute and its underlying purpose may be rejected by the courts"). See also *Bureau of Old Age Assistance* v. *Commissioner of Pub. Welfare*, 326 Mass. 121, 123-124 (1950). We are not at liberty to ignore such a clear legislative command. See *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 633 (2005) ("if [court] conclude[s] that the statute is unambiguous, [it] give[s] effect to the Legislature's intent"). See also *Massachusetts Mun. Wholesale Elec. Co.* v. *Energy Facilities Siting Council*, 411 Mass. 183, 194 (1991) ("an administrative agency has no authority to promulgate rules or regulations that conflict with the statutes or exceed the authority conferred by the statutes by which the agency was created").

The department has discretion to choose the clinical authorities upon which to rely, but it may not omit reference to those authorities in its regulations, nor may it rely upon standards and clinical judgments that are undisclosed and untethered to the statutory mandate.[5] See generally *Smith*, *supra* at 646-647 (agency must include in its regulations and consider all criteria

---

[5]The implicit, if not explicit, theme of the department's argument is that once it identifies the objective tests and requires a clinician's review in its regulations, it has identified the relevant clinical authorities. We recognize that the term clinical authorities can have a dual meaning. For example, the interstate compact on mental health, 18A Mass. Gen. Laws. Ann. c. 123 App. § 1-1, art. IV(*a*), makes reference to clinical authorities in this and other States who are responsible for examining and receiving patients under the compact. Here, however, the department itself has acknowledged in its previous regulations and its memorandum in the Superior Court that the term clinical authorities means standards or findings by recognized external professional experts or

enumerated by Legislature). Here, the legislative requirement that the regulations describe clinical authorities fulfils two important purposes. First, it ensures that the department's regulations comport with accepted medical standards. Second, the legislative mandate gives clear context and direction to applicants. In the absence of a description in 115 Code Mass. Regs. § 2.01 of clinical authorities,[6] applicants (and reviewing courts) lack the standards by which they can understand and evaluate claims for services. Compare *Massachusetts Eye & Ear Infirmary* v. *Commissioner of the Div. of Med. Assistance*, 428 Mass. 805, 812-817 (1999) (regulations failed to define terms in meaningful manner and conflicted with governing Federal statute).

The proceedings in this case demonstrate the pitfalls inherent in applying the regulations without the benefit of anchoring clinical authorities. The department has taken disparate positions in this case regarding the meaning of mental retardation and sub-average intellectual functioning. In its Superior Court memorandum filed in opposition to Tartarini's motion for judgment on the pleadings (memorandum), the department stated that its "definition [of mental retardation] relies upon elements

associations, not employees of the department. This only makes sense. Otherwise, the definition of clinical authorities in this context would be completely circular. Similarly, the standardized tests described in the regulations are measurements of intelligence or adaptive abilities; they are not clinical authorities.

[6]In contrast to the Federal government's process for publication of Federal regulations, Massachusetts maintains no published history of the comments on regulations. Nor were the regulations at issue here accompanied by a preamble that would explicate which authorities were adopted in whole or in part. Further, we "are not permitted to take notice" of the unpublished regulatory history. *Saxon Coffee Shop, Inc.* v. *Boston Lic. Bd.*, 380 Mass. 919, 926 (1980). See G. L. c. 30A, § 6.

We note that in other contexts where the Legislature has required that an agency adopt standards or guidelines by regulation, the agency has promulgated regulations which specifically reference the clinical authorities upon which they are based. For example, the regulations of the Department of Mental Health incorporate by reference the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) in defining "clinical criteria." 104 Code Mass. Regs. § 29.04(2)(a)(3) (2009). See G. L. c. 123, § 2, inserted by St. 1986, c. 599, § 38 (requiring that department "adopt regulations . . . which establish . . . the highest practicable professional standards"). Similarly, the Sex Offender Registry Board has promulgated extensive regulations which cite numerous clinical studies. See G. L. c. 6, § 178K(1); 803 Code Mass. Regs. § 1.40(2)-(21) (2002).

of the definition of the American Psychological Association (2000) and the American Association on Mental Retardation (2002), but is also informed by the insights of the National Research Council (2002)." None of these authorities is described in the regulations. The department also stated in its memorandum that "[a]n IQ of 70 is not an absolute ceiling for the psychologist determining eligibility in all cases, but it is the common professional benchmark." This statement is at odds with the testimony of the department's expert who treated the score of 70 as a cut-off score.[7] The hearing officer also considered the score to be a cut-off. On appeal, the department now argues that the regulation does establish a "ceiling."[8] Thus, in the absence of anchoring principles, the application of the regulatory definition of mental retardation became a moving target. The applicant may not be made to guess at the standards governing eligibility for services. See generally *Massachusetts Eye & Ear Infirmary, supra.*

In the proceedings before the Superior Court both parties attempted, for the first time, to introduce evidence of clinical authorities in support of their respective positions. A judge conducting a review under G. L. c. 30A, § 14, generally does not consider matters outside the administrative record, whether by affidavit or judicial notice. See G. L. c. 30A, § 14(6); *She Enterprises, Inc.* v. *State Bldg. Code Appeals Bd.*, 20 Mass. App. Ct. 271, 273 (1985). However, even if we were to consider the authorities of which the department sought judicial notice, that review would only underscore the interpretive problem. First, the clinical authorities have not been described in the regulations, and there is no showing that the regulations were based on these authorities. Second, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Dis-

---

[7]The expert did not testify whether she applied the standard error of measurement of plus or minus five points to the IQ score. The hearing officer did consider the standard error of measurement and found it inapplicable. The department here argues that under the regulations only qualified practitioners, in this case its expert, may consider and apply these "psychometric properties" pertaining to the standard error of measurement when reviewing a particular test. See 115 Code Mass. Regs. § 6.02(3)(2) (2006).

[8]The department leaves the adjustment of scores based on the standard margin of error to its clinicians. See note 7, *supra.*

orders IV-TR (4th ed. text revision 2000) (DSM-IV-TR), upon which the department relies, provides that individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive functioning may be diagnosed as mentally retarded, *id.* at 41-42, and that "[i]mpairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with [m]ental [r]etardation." *Id.* at 42.[9] Conversely, the DSM-IV-TR also states that an individual with an IQ below 70 who exhibits "no significant deficits or impairments in adaptive functioning" would not be diagnosed as a person with mental retardation. *Ibid.* In addition, the DSM-IV-TR references a score of "about" 70 as the upper limit of clinical mental retardation, *id.* at 41, and not a bright line as the department suggests.[10] These nuances reinforce the wisdom of the statutory mandate requiring the department to describe the clinical authorities upon which it relies.

We recognize that the difficulties inherent in drawing the line between borderline intelligence and significantly sub-average intelligence cannot be overstated, and that the department is entitled to substantial deference in that regard. It is for this reason that the statutory anchor of clinical authorities assumes central importance. This opinion does not express a view whether the regulations comport with clinical authorities. Nor does it express a view whether Tartarini is a person with an intellectual disability.[11] Tartarini's present classification as a person with

[9]Judicial notice of the DSM-IV is approached with caution. "The DSM-IV itself cautions against the use of its diagnostic criteria and descriptions by individuals who are not clinically trained or for purposes other than diagnosis" (footnote omitted). *Doe, Sex Offender Registry Bd. No. 89230* v. *Sex Offender Registry Bd.*, 452 Mass. 764, 776 & n.20 (2008).

[10]Tartarini relies on an AAIDD definition of "intellectual disability" (which also was not part of the administrative record) that states "an IQ test score of around 70 or as high as 75 indicates a limitation in intellectual functioning." The department states that this portion of the AAIDD guidelines was rejected by the department. We do not know which part of the AAIDD guidelines was relied on by the department. See *supra.*

[11]We also recognize that the hearing officer found that Tartarini also did not meet the adaptive functioning test. Because the statute links the definition of sub-average intelligence with the functional test, and because we cannot be sure whether, upon explicit adoption of clinical authorities, the same finding would again be made with respect to the intelligence prong, on remand the department shall give this matter full reconsideration.

borderline intelligence derives from application of an inadequate regulatory definition. That determination is therefore invalid. The regulations defining inadequately developed or impaired intelligence must, pursuant to G. L. c. 123B, § 1, identify and describe the clinical authorities on which they are based.

The judgment is reversed and a new judgment is to enter remanding the case to the department for further proceedings consistent with this opinion.

*So ordered.*